IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

**TONY ANTHONY GRIFFIN**                                           **PLAINTIFF**


**V.**                              **CASE NO. 3:18-CV-03109**


**NURSE SARA HOLLIS, Baxter County
Detention Center; and JAIL ADMINISTRATOR
TONY BECK, Baxter County Detention Center**            **DEFENDANTS**


## MEMORANDUM OPINION AND ORDER

This is a civil rights action filed by the Plaintiff, Tony A. Griffin, pursuant to 42

U.S.C. § 1983. Griffin proceeds *pro se* and *in forma pauperis*. The claims at issue in this

case arise out of Griffin's incarceration in the Baxter County Detention Center ("BCDC")

from August 4, 2018, through September 14, 2018. Griffin names as Defendants Nurse

Sara Hollis and Jail Administrator Tony Beck.

Griffin, who is Black, contends his constitutional rights were violated when

Defendants exhibited deliberate indifference to his serious medical needs and he was

denied medical care on the basis on his race. Griffin has sued the Defendants in their

personal capacities only. (Doc. 20 at 4).

The case is before the Court on the Defendants' Motion for Summary Judgment.

(Docs. 24-26, 40). Plaintiff has responded to the Motion, (Docs. 31-32, 42, 48[1]), and it

---

[1]This document is about Plaintiff's treatment during his current incarceration in the BCDC.
Plaintiff is advised that he will need to file a separate case about these issues. Of course,
he must exhaust the BCDC's grievance procedure before he files a new case.

is ready for decision.

## I. BACKGROUND

### A. Prior Medical History

During his deposition,[2] Griffin testified that he had been in a serious car accident in 2001 or 2002 during which he sustained injuries to his head, back, left leg, and both feet. (Doc. 26-8 at 17). As a result of the head injury, Griffin has problems with his memory, including forgetting things he is told and people's names. *Id.* at 26-28. In 2011, Griffin had a light stroke. *Id.* at 19. Griffin has sciatic nerve damage to his left side. *Id.* While he was in prison in 2014 or 2015, Griffin had stents put in his heart. *Id.* at 21. Griffin testified that he has to take "a lot of medicine" for his heart, his blood pressure, gastroesophageal reflux disease ("GERD"), rheumatoid arthritis, pain in his shoulder from an injury, and sciatic nerve damage to his left leg. *Id.* at 21-24. However, he testified he did not "even know half the medicine he takes now." *Id.* at 21.

Griffin testified that during periods of time when he was not incarcerated, he did not have ongoing care for his medical problems. (Doc. 26-8 at 17). In fact, he stated that he had not had an outside doctor for years. *Id.* at 17-18. His grandmother, who was a nurse and a full-blooded Cherokee, provided Griffin with "natural herbs and stuff that helped." *Id.* at 19. Griffin testified that when he was in Arkansas Department of Correction ("ADC"), he was put on approximately 17 different medications. *Id.* at 22.

---

[2] According to defense counsel's statement at the end of the deposition, the deposition was concluded prematurely when Griffin "became aggressive and slammed his things on the table and left the room." (Doc. 26-8 at 66). In his response to the summary judgment motion, Griffin indicates he had to terminate the interview because of facial expressions being made by defense counsel which he interpreted as questioning the veracity of his testimony.

2

Griffin also took seven or eight medications at the halfway house, OMART, where he was placed when he was paroled. *Id.* at 22.

On August 4, 2018, Griffin was arrested at the Mountain Home Motel where he had lived for a "little over a year." (Doc. 26-8 at 29-30). Griffin testified he had his medications, but the arresting officers refused to take them. *Id.* at 29-30. The medication Griffin had at the hotel had been filled by OMART at a pharmacy in Gassville, Arkansas. *Id.* at 29-30. Griffin testified that the medication lasted over a year because he was not taking it daily in accordance with the prescription directions, with the exception of the non-prescription 81 mg Bayer aspirin. *Id.* Griffin testified that OMART had given him "more than what they were supposed to" when he left there. *Id.* In fact, Griffin stated that one of the nurses at OMART advised him to "keep a lot of [the medication], that way when you get out, you were good." *Id.* at 35. Griffin testified he could not remember all the medications but knew he was taking high blood pressure and heart medication and pain pills. *Id.* at 33. According to Griffin, when he tried to get help from three different doctors in Mountain Home, where he was living, "they refused me because of my color. They said they don't do my kind." *Id.* at 31-32. Griffin testified throughout his deposition that the population of Mountain Home in general, and the detention center personnel in particular, including the Defendants, were racist and wanted any Blacks to move out of the area.

## B. Incarceration at the BCDC

Griffin was booked into the BCDC on August 4, 2018. (Doc. 26-2 at 1). He remained incarcerated there until September 14, 2018, when he was transferred to the ADC. *Id.*

3

Griffin testified that the day he was arrested, he spoke to Nurse Hollis and advised her that his medication had been left in his hotel room. (Doc. 26-8 at 44-45). Griffin stated that he advised Nurse Hollis that he needed his heart medication. *Id.* at 45. According to Griffin, Nurse Hollis remarked that Griffin worked with her brother at Bass Cat Boats, made good money, and should give her some. (Doc. 26-8 at 47-48). He refused, and after that, Nurse Hollis avoided him. *Id* at 45. Administrator Beck was not a party to these events. *Id.*

On September 6, 2018, at approximately 4:15 p.m., Nurse Hollis was talking to Griffin's cellmate, who was on suicide watch about "meds and stuff." (Doc. 26-8 at 39). Griffin testified that he asked Nurse Hollis if he could get something for "pain and stuff." *Id.* He explained that he was not allowed to bring his "heart medication and stuff" and was having chest pain. *Id.* According to Griffin, Nurse Hollis "looked at [him] kind of funny and said he would have to fill out a "paper.'" *Id.* Griffin testified he filled out the medical request form and gave it to her. *Id.* at 40. Then, "she walked off, c[a]me back" and "slid it up under the door."[3] *Id.* Griffin testified that Nurse Hollis formerly worked at an ADC unit where he had been incarcerated, and he believed she knew he was taking heart medication. *Id.* at 43. Griffin stated that he told her he needed his heart medication and that it was in his hotel room. *Id.* Griffin could not recall the name of the medication. *Id.*

Griffin testified that on the medical request form he had asked for medication but indicated that he did not have a doctor. (Doc. 26-8 at 41). He asked for Bayer aspirin

[3] This medical request form does not appear in Griffin's jail file, presumably because Nurse Hollis returned the form to Griffin.

and told Nurse Hollis that his medications were still sitting in his hotel room. *Id.* He asked if someone could be sent to get them. *Id.* Griffin testified his parole officer and Officer Michael Day, who was in the criminal investigation division, indicated Griffin's belongings were still at the hotel. *Id.* at 41-42. According to Griffin, Officer Day, Nurse Hollis, and an unidentified woman were all sitting in a small room "laughing and stuff and were calling [him] 'Niggers.'" *Id.* at 42.

Griffin stated that on September 7, 2018, Nurse Hollis refused him medication, stating that she did not have to "listen or do a damn thing that you tell me." (Doc. 26-8 at 47). She then told him that he could "lay in the cell and die." *Id.* at 46. Griffin further testified that he begged Nurse Hollis "over, and over, and over" for something to take for his heart. *Id.* at 64. He believed Nurse Hollis had some of the same type of medication at the facility. *Id.* According to Griffin, Nurse Hollis did not even provide him with the Bayer aspirin. *Id.* at 64-65. Instead, "some female jailer snuck me some Bayer aspirin while I was there." *Id.* at 64.

Griffin maintains that Administrator Beck said to him: "Nigger, you can lay up in the cell and die, for all I care." (Doc. 26-8 at 45). Griffin did not believe this occurred on the same day that Nurse Hollis made similar statements. *Id.* at 45-46. Griffin also asserts that Administrator Beck was a "bully." *Id.* at 48-49.

On September 7, 2018, Griffin submitted a grievance complaining that Nurse Hollis failed to provide him with medical attention. (Doc. 26-3 at 1). He stated he had a life-threatening illness. *Id.* He requested to be given an aspirin every day for his heart. *Id.*

5

He also indicated that Nurse Hollis talked to him like he was a "boy."[4]  *Id.*  In response, a jailer was instructed to provide Griffin with a medical request form and to log it in the Guardian Inmate Tracking System.  *Id.*

A medical request form dated September 8, 2018 appears in the record.  (Doc No. 26-4 at 1).  In response to questions contained on the form, Griffin stated he had no current doctor, did not have a current pharmacy, could not recall the names of any of his medication except the Bayer aspirin, and he did not know if he had any drug allergies.  *Id.*  He also asked for medical attention for his heart.  *Id.*  Griffin's signature appears on the medical request.  *Id.*  On the bottom portion of the form is an area to be completed by the medical provider.  *Id.*  The date of the exam is blank, and in the area for medical notes, the word "refused" is written.  *Id.*  There is no signature following this remark.  *Id.*

On the morning of September 12, 2018, Clifford Beck[5] wrote that he had spoken to Griffin regarding his grievance and told him to complete a medical request form.  (Doc. 26-5 at 2).  A jailer was instructed to provide Griffin with the form.  *Id.*  The same day, Advanced Practice Nurse Denise Clifton-Jones and Nurse Hollis started to complete a health service request form for ADC jail detainees.  (Doc. 26-4 at 2).  The area on the form for the detainee to describe his injury or illness is blank.  *Id.*  Griffin did not sign the form.  *Id.*  According to the nurses, Griffin walked out of the medical office before filling in or signing the form.  (Doc. 26-4 at 3; Doc. 26-5 at 1).  Advanced Practice Nurse Denise Clifton-Jones described the encounter as follows:

Pt has completed a sick call for[m] requesting "heart[.]"  When he arrived

[4] Parts of this grievance are illegible.  (Doc. 26-3 at 1).

[5] There is no indication if Clifford Beck is related in any way to Defendant Tony Beck.

> to the exam room I attempted to decipher what type of problems he has/had
> and he became belligerent and began yelling stating he doesn't understand
> why it is so hard to get an aspirin.   When I attempted to explain to him that
> I at least need his pharmacy information so that I can verify the medications
> he is supposed to be taking.   He began yelling again and cursing that he is
> 9 hours from home and doesn't know what medications he is supposed to
> be taking nor does he know what pharmacy he has been using—at which
> time he exited the medical office without completing the visit.

(Doc. 26-5 at 3).   Griffin, however, maintains he did not walk out of the office but was
instead told to leave.   (Doc. 32 at 6).

Griffin maintains that Administrator Beck[6] went along with Nurse Hollis in refusing
him medical attention and denied his request to go to the hospital when he was having
"real bad chest pain."   (Doc. 26-8 at 51-52).   Griffin indicates he told Administrator Beck
that he did not have his nitro pills to take and needed to go to the hospital.   *Id.* at 52.
According to Griffin, Administrator Beck's response was: "Nigger, I ain't taking you
nowhere."   *Id.*   Griffin could not recall what day this encounter took place.   *Id.*   Griffin
further testified that Administrator Beck said: "Nigger, you can lay up in the cell and die,
for all I care."   *Id.* at 45.   Griffin testified he did not know if he had a heart attack that day
since he was never taken to a doctor or the hospital.   *Id.*   Griffin stated that it was
obvious if he had a heart attack, it was not serious enough to kill him.   *Id.*   Griffin also
asserts that both Defendants refused to go and get his medication from the hotel.   *Id.* at
58.

On September 14, 2018, Griffin underwent a transfer assessment at the ADC.

---

[6] Griffin testified that he also believed Administrator Beck was one of three officers who
used excessive force against him.   (Doc. 26-8 at 59-60).   However, Griffin did not assert
this claim in his complaint.   *Id.*   As a result of this incident, Griffin indicated his shoulder
was hurt.   *Id.* at 24.

(Doc. 26-4 at 4). Griffin was placed on Amlodipine Besylate Tab/10 mg [7] and Hydrochlorothiazide Tab/25[8] mg; lab tests were ordered; and, he was referred for a physical examination "for any medical restrictions." *Id.* at 4-5. Griffin testified he was put on bed rest and medications were started. (Doc. 26-8 at 52). Griffin maintains that he was told his blood pressure was high and that the BCDC personnel "were trying to kill [him]." *Id.* at 53.

The BCDC is operated in accordance with written policy, and "the staff is expected to conform to policy." (Doc. 26-7 at 1). The jail administrator, here Defendant Tony Beck, is responsible "for the overall operation of the jail." *Id.* The BCDC provides "jail inmates with medical and health care to the standards" of existing Arkansas and United States statutory law and court precedents. (Doc. 26-7 at 6). To this end, the BCDC "shall provide . . . medical personnel who are duly licensed in the State of Arkansas." *Id.* One licensed practical nurse ("LPN") is "employed full time and . . . maintains an office and presence inside the confines of the Detention Center when working and on duty." *Id.* There is also one Advanced Practice Registered Nurse (APRN) employed part-time and "who shall regularly be available in person at the Detention Center to see jail inmates a minimum of two (2) times per week." *Id.* Both "will work under the general authority and direction of a licensed physician . . . however the physician shall not have responsibility for nor be required to keep or maintain a presence at the Detention Center,

---

[7] This medication is used to treat high blood pressure and chest pain (angina). https://medlineplus.gov/druginfo/meds/a692044.html (accessed Sept. 25, 2019).

[8] This medication is used to treat high blood pressure and edema caused by various medical conditions, including heart disease. https://medlineplus.gov/druginfo/meds/a682571.html (accessed Sept. 25, 2019).

neither shall the physician be responsible for on-site general supervision of the LPN or APRN." *Id.*

When an inmate is booked in, the booking jailer "shall ask a series of basic medical questions to determine, among other things, whether the inmate has any injuries, is under the care of a physician, has any communicable diseases, and is taking any medications prescribed by a licensed health care professional." (Doc. 26-7 at 7). The responses to the questions are to be "fully annotated in the booking file for later review by supervisory personnel and/or licensed medical personnel providing services to the Detention Center." *Id.* If such questions were asked of Griffin in this case, no record of Griffin's responses has been provided to the Court.

Requests for medical services are to be made in writing on a medical request form. (Doc. 26-7 at 7). "Other than in cases of emergencies or urgent situations in which jail personnel reasonably believe medical care is immediately necessary, a jail inmate[] will only be provided with professional medical care if they complete a "Medical Request Form" and turn it in for review by licensed medical personnel." *Id.* The forms are available once per day "during the 8:00 pm distribution of medication time period." *Id.* Any medical request forms that are completed "will be logged and annotated in the Guardian Inmate Tracking System, which will log the date and time that the completed form was returned." *Id.* The completed forms are reviewed by the LPN.

"Jail inmates who have completed the Medical Request Form are permitted to speak personally with and be seen by the LPN during times designated for the dis[tribution] of medication by the LPN." (Doc. 26-7 at 7). Inmates will be seen by the "APRN during such times as the APRN is at the Detention Center, if sufficient information

is articulated on the Medical Request Form to necessitate the need to be seen by the APRN." *Id.* This decision will be determined by the APRN." *Id.* at 8. For each inmate seen, the "LPN and APRN shall keep detailed and specific medical notes . . . that will identify the nature of the complaint and necessary action, if any, that was taken or decisions made." *Id.*

The only prescription medications that are provided and dispensed to inmates are those that have been duly and lawfully prescribed by qualified medical personnel. (Doc. 26-7 at 9). All medications dispensed are logged in the Guardian Inmate Tracking System. *Id.*

With respect to grievances, BCDC policy provides that "[u]pon investigation of the complaint, the Jail Administrator will prepare a written response to the inmate." (Doc. 26-7 at 12). The response is to include whether the Jail Administrator agrees or disagrees with the complaint; an explanation of how the conclusion was reached; and, any action that has been taken or will be taken to correct the problem or situation. *Id.*

In accordance with the Equal Protection Clause, the policy of the BCDC is for all personnel to treat similarly situated persons in the same or substantially the same manner. (Doc. 26-1 at 1-2; Doc. 26-7 at 4). There must be a rational basis for any "differences of treatment of persons encountered by the Sheriff or his deputies and the rational basis must be related to a legitimate order or security objective of the Sheriff's Office." *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "show[s] that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III. DISCUSSION

Defendants maintain they are entitled to summary judgment for the following reasons: (1) there is no proof of any personal involvement by Defendant Beck; (2) no Defendant was deliberately indifferent to Plaintiff's serious medical needs; (3) allegations of name-calling do not rise to a constitutional violation; and, (4) Defendants are entitled to qualified immunity.

### A. Personal Involvement by Defendant Beck

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege facts, which if proven true, would demonstrate the named defendants violated the plaintiff's federal constitutional rights while acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). At the time of the events in question, Tony Beck was the jail administrator

11

or warden of the BCDC. Defendants maintain Administrator Beck is named only in the journal entries attached to the amended complaint. (Doc. 20). Defendants contend that no acts or omissions on Administrator Beck's part are identified. (Doc. 25 at 4). They argue that Griffin's amended complaint does not allege that "that [Administrator] Beck called him any names or that [Administrator] Beck was in a position to provide him with medical care." *Id.* at 5. Defendants concede that in his deposition, Griffin maintains that Administrator Beck refused to take Griffin to the hospital when he was having chest pains and used racially derogatory terms in referring to Griffin.

To the extent Defendants are challenging the sufficiency of the amended complaint as against Administrator Beck, the argument is without merit. Griffin specifically alleged that he was denied medical care by both Defendants. (Doc. 20 at 4). Griffin also alleged that he was the victim of a hate crime by both Defendants. *Id.* at 5. The attached journal entries are considered part of the complaint and contain additional factual allegations. *See, e.g., Meehan v. United Consumers Club Franchising Corp.,* 312 F.3d 909, 913 (8th Cir. 2000) (adopting a broad view of Fed. R. Civ. P. 10(c) and stating that "materials attached to the complaint as exhibits may be considered in construing the sufficiency of the complaint"). While the journal entries contain more factual allegations with respect to Nurse Hollis than Administrator Beck, it is clear that Griffin is asserting claims against Administrator Beck in the amended complaint. Moreover, as conceded by Defendants, the summary judgment record contains Griffin's sworn deposition testimony regarding the claims being asserted.

Defendants correctly point out that there must be some personal involvement on the part of Administrator Beck before he may be held liable. "Liability under section 1983

12

requires a causal link to, and direct responsibility for, the deprivation of right. To establish personal liability of a supervisory defendants, [plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (internal quotations and citation omitted). General responsibility for supervising a detention center is insufficient to establish personal involvement. *Reynolds v. Dormire*, 636 F.3d 976, 981 (8th Cir. 2011). Griffin has testified as to the actions taken by Administrator Beck in personally denying Griffin medical care and in discriminating against him based on his race. Griffin has also stated that Administrator Beck was aware of Nurse Hollis's actions and not only turned a blind eye but condoned the conduct. Griffin has sufficiently set forth facts regarding the personal involvement of Administrator Beck to support liability.

Defendants also argue that Administrator Beck was not part of the medical staff and did not have authorization to provide anything more than temporary first aid in emergency situations. (Doc. 25 at 5). It is true that a "general responsibility for supervising the operations of a prison is insufficient to establish personal involvement required to support liability." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Moreover, a supervisor, who lacks medical expertise, cannot be liable for "medical staff's diagnostic decision[s]." *Id.* However, "a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995). "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994) (internal

quotations and citation omitted). As noted above, Griffin has alleged both that Administrator Beck was personally involved in the alleged constitutional violations and that he was aware of Nurse Hollis's actions.

However, personal involvement does not establish liability. Administrator Beck must also meet the requisite standard of culpability applicable to each claim. The Court now turns to an examination of the claims asserted in light of the facts contained in the summary judgment record.

## B. Deliberate Indifference to Serious Medical Needs

The Eighth Amendment's prohibition against cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs.[9] *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court recognized that a prisoner's only access to medical care is through prison officials. *Id.* at 103. The Court held that the Eighth Amendment required prison officials to provide adequate medical care to inmates. *Id.*

To prevail on his Eighth Amendment claim, Griffin must prove that Defendants acted with deliberate indifference to his serious medical needs. *Id.*

> The test for deliberate indifference consists of two prongs. First, an inmate must show that he suffered from an objectively serious medical need. Second, an inmate must show that the defendant knew of and deliberately disregarded that need. Deliberate disregard is a mental state equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposely or knowingly bring about a substantial risk of serious harm to an inmate.

---

[9] The Eighth Circuit applies the Eighth Amendment deliberate indifference standard of culpability for all claims that prison officials failed to provide pre-trial detainees with adequate medical care. *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006).

14

*Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (quotations and citations omitted).

## 1. Prong One — Objectively Serious Medical Need

Defendants maintain that Griffin did not suffer from a serious medical need. (Doc. 25 at 8-9). Defendants concede Griffin has now identified a number of medical issues; however, they maintain he only complained of chest pains and requested medical care for his heart while he was in the BCDC. *Id.* According to Defendants, "[o]ther than his own testimony, there is no evidence showing [Griffin] suffered a heart attack or other heart issue which would constitute an objectively serious medical need on the dates in question." *Id.*

To establish that he suffered from an objectively serious medical need, Griffin must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted). Viewed in the light most favorable to Griffin, the record establishes the following: Griffin has back problems (a "messed up" disk), sciatic nerve damage on his left side, high blood pressure, GERD, rheumatoid arthritis, and stents were placed in his heart. Prior to his incarceration at the BCDC, Griffin had been in the ADC and then in OMART. During his ADC incarceration, Griffin was on multiple medications and required the placement of stents in his heart. Griffin took medications for his heart (including nitro), his blood pressure, GERD, rheumatoid arthritis, and pain. According to Griffin, Nurse Hollis had worked at an ADC unit he had been confined to, was one of the nurses he saw, and, at the time, he was taking multiple medications including heart medication. When he was released to OMART, Griffin continued on multiple medications. Griffin testified he was

15

released from OMART with a supply of medication. Griffin also testified that he attempted to get appointments with three different doctors in Mountain Home but was refused on the grounds that "they don't do my kind." Although Griffin had not seen a doctor recently, when he was arrested on August 8, he had in his possession a number of medications he claims were necessary to treat his various medical conditions. Griffin also testified that prior to his incarceration at the BCDC, he was taking a Bayer aspirin daily for his heart.

When arrested and taken to the BCDC, Griffin testified that he informed Defendants his medications were in his motel room; he begged over and over for treatment for his heart; and he advised them that he was suffering from chest pains and asked to be taken to the hospital because he believed he was having a heart attack.[10] Although outside the relevant time frame, the ADC records show that the day he was transferred from the BCDC to the ACD, September 14, 2018, he was prescribed medications for high blood pressure and chest pain.

Defendants state in their brief that Griffin showed no objective signs of a heart attack; however, there is no record support for this statement. Defendants have not submitted their own affidavits, the affidavits of other medical personnel, or any other documentation or sworn testimony to support this statement. In fact, there is nothing to show that Griffin's vital signs were even taken. Given Griffin's uncontradicted sworn

_____

[10] Common signs and symptoms of heart attack include: pressure, tightness, pain or squeezing or aching sensation in your chest or arms that may spread to your neck, jaw or back; nausea, indigestion, heartburn or abdominal pain shortness of breath; cold sweat; fatigue; and lightheadedness or sudden dizziness. However, some people have no symptoms. https://www.mayoclinic.org/diseases-conditions/heart-attack/symptoms-causes/syc-20373106 (accessed October 24, 2019).

statements, there is a genuine issue of material fact as to whether Griffin suffered from a serious medical condition.

## 2. Prong Two — Subjective Knowledge and Deliberate Disregard

The subjective component addresses whether Defendants acted with a sufficiently culpable state of mind. Griffin must show that Defendants actually knew of but deliberately disregarded his serious medical needs. To establish deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Corr. Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) (citation omitted). The Supreme Court has indicated that in evaluating the subjective component, both the Defendant's attitudes and conduct may be examined. *Helling v. McKinney,* 509 U.S. 25, 36 (1993).

"A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis.'" *Holden v. Hirner,* 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted). If the need for medical attention is obvious to a layperson, the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub,* 638 F.3d at 919 (citing *Roberson v. Bradshaw,* 198 F.3d 645, 648 (8th Cir. 1999)).

The record evidence shows that when Griffin was booked into the BCDC, no medical questionnaire was completed despite the policy mandating it. He received no intake medical screening despite having advised Nurse Hollis at the time of his booking that his medications, including medication for his heart, were left in the hotel room when

17

he was arrested. Nothing in the record suggests Nurse Hollis made any effort to determine what medications Griffin had been on after he spoke to her on August 4, 2018. There is no suggestion that Nurse Hollis requested Griffin's medical records from the ADC or OMART.

Griffin advised Nurse Hollis on September 6, 2018, that he was having chest pain. Nurse Hollis did not examine Griffin. She merely told him to fill out a medical request form. In a situation determined to not constitute an emergency, requiring a written medical or sick call request form is reasonable. *Hartsfield v.* Colburn, 491 F.3d 394, 398 (8th Cir. 2007). However, there is no indication that Nurse Hollis determined this to be a non-emergency situation.

Griffin advised Nurse Hollis that he needed Bayer aspirin and asked if someone could go pick up his medications. When Griffin filled out the medical request form, he asked for Bayer aspirin for his heart. Griffin could not provide the names of the medications he was on, name his doctor, or provide the pharmacy the medication was obtained from. Griffin maintains that this medical request form was returned to him by Nurse Hollis and is not part of the record.

Griffin testified he asked multiple times for some type of medication for his heart. Griffin indicated that Nurse Hollis refused and said she did not have to "listen or do a damn thing that you tell me." She stated that Griffin could "lay in the cell and die." Griffin also heard Nurse Hollis referring to him by a racially derogatory term—"Nigger."

Administrator Beck also told Griffin: "Nigger, you can lay in [your] cell and die for all [I] care." When Griffin indicated he was having heart problems, did not have his nitro pills, and needed to go to the hospital, Administrator Beck again referred to Griffin as a

18

"Nigger" and told Griffin he was not taking him anywhere. *See Plemmons v. Roberts*, 439 F.3d 818, 825 (8th Cir. 2006) (deliberate disregard found when officers ignore an inmate who tells them he has heart disease and is experiencing related symptoms).

On September 7, 2018, Griffin submitted a grievance about Nurse Hollis's conduct and stated he had a life-threatening medical condition. Griffin was told in response to submit a written medical request. Griffin completed the medical request form on September 8, 2018, and he was not seen until September 12, 2018.[11] When he was seen by Nurse Hollis and another nurse, Griffin was told to leave the office and received no medical treatment. His vital signs were not taken. When Griffin was transferred to the ADC just two days later, on September 14, 2018, he was immediately started on medication for angina and high blood pressure.

No sworn statement has been submitted by Administrator Beck or Nurse Hollis refuting Griffin's sworn testimony. The Court believes there is ample evidence, when viewed in the light most favorable to the Griffin, to create a genuine issue of material fact as to whether Defendants were deliberately indifferent to Griffin's serious medical needs.

### 3. Qualified Immunity

Defendants also maintain they are entitled to summary judgment on the basis of qualified immunity. Government officials are entitled to qualified immunity if their conduct does "not violate clearly established statutory or constitutional rights of which a

---

[11] In a non-emergency situation, requiring a written medical or sick call request is reasonable. *Hartsfield v. Colburn*, 491 F.3d 394, 398 (8th Cir. 2007). Here, Griffin submitted the request forms but testified he did not know the answers to the questions asked. In other words, he did not unreasonably or willfully refuse to submit all information requested. He simply did not know it.

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A two-part test if used in determining if qualified immunity applies: (1) "whether the facts alleged, construed in the light most favorable to [the Plaintiff], establish a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable officer would have known his actions were unlawful." *Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014).

For qualified immunity purposes, the facts as set forth above demonstrate that the alleged conduct on the part of each of the Defendants violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court must now ask if the right was clearly established "so that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (citation omitted). With respect to Administrator Beck, the Eighth Circuit has found that it is unlawful for an official to fail to obtain medical treatment for an inmate who directly communicates he is a heart patient and is experiencing classic heart symptoms. *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 863 (8th Cir. 2006); *see also McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009) ("Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention."). Administrator Beck made no notations in Griffin's medical records showing his observations of Griffin's physical condition. In fact, Administrator Beck made no notations regarding Griffin's request, and there is no suggestion Beck called for medical personnel to check on Griffin. Under the circumstances, the law was clearly established that a reasonable official would know that ignoring Griffin's complaints and failing to provide treatment would violate Griffin's constitutional rights. Administrator Beck is not

20

entitled to qualified immunity.

Similarly, the law was clearly established that the failure of medical staff to screen, monitor, obtain medical records, or even take the vital signs of an inmate who indicated he was on multiple prescription medications, had stents in his heart, had high blood pressure, and had chest pain for which he had been receiving treatment when he was in the ADC and at OMART, would violate Griffin's constitutional rights. *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989) ("Delay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature"); *see also Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (prison nurse denied qualified immunity when she was aware of the risks but "ignored and/or acted with deliberate indifference when faced with those risks"). The fact that Griffin had not seen a physician or purchased medication in the year that he was free world does not negate the obligation of medical personnel to provide adequate medical care. *Dadd v. Anoka Cnty.*, 827 F.3d 749, 756 (8th Cir. 2016) ("It is clear that a pretrial detainee has a constitutional right to adequate medical care while in custody"). Nurse Hollis is not entitled to qualified immunity.

## C. Racial Discrimination

### 1. Use of Racial Slurs, Name-calling, or Derogatory Term

Defendants argue they are entitled to summary judgment because the mere use of racial slurs, name-calling, or the use of derogatory terms does not state a constitutional claim. It is true that, standing alone, the use of deplorable and unprofessional racially derogatory terms does not state a constitutional violation. *See Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) (verbal abuse of students including yelling, screaming, and

name-calling does not demonstrate a constitutional violation); *Burton v. Livingston*, 791 F.2d 97, 101 n.1 (8th Cir. 1986) (an allegation that an individual prison guard used racially offensive language in dealing with a prisoner does not, by itself, state a claim under the Equal Protection Clause).

However, "the use of racially derogatory language is not without legal significance. Such language is strong evidence of racial animus, an essential element of any equal protection claim. Thus, although the use of racially derogatory language, by itself, does not violate the Constitution, it can be quite important evidence of a constitutional violation." *DeWalt v. Carter*, 224 F.3d 607, 612 n.3 (7th Cir. 2000); *see, e.g., Blades v. Schuetzle*, 302 F.3d 801 (8th Cir. 2002) (if the racially discriminatory language is "pervasive or severe enough to amount to racial harassment," the Fourteenth Amendment may be violated).

Here, Griffin challenges not just the use of the racially offensive language, he also maintains he was deprived of an established constitutional right, the Eighth Amendment right to adequate medical care, based on his race. According to Griffin's sworn testimony, when he sought medical care, both Defendants called him a "Nigger" and told him he could lay in his cell and die. Griffin was not provided medical care.[12] This goes beyond the mere use of racially derogative terms. *See McCleskey v. Kemp*, 481 U.S. 279, 292-93 (1987) (must show both a racially discriminatory purpose and effect of the action).

---

[12] The Court again notes that neither Defendant submitted an affidavit.

## 2. Equal Protection/Racial Discrimination

Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citation omitted). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found*, 538 U.S. 188, 194 (2003) (internal quotations and citation omitted.)

Only *deliberate* discrimination is actionable under the Equal Protection Clause. *Personnel Adm'r. v. Feeney*, 442 U.S. 256, 273 (1979); *Washington v. Davis*, 426 U.S. 229, 239-48 (1976). "Discriminatory purpose can be proved with various kinds of direct and circumstantial evidence, but it is most often proved with evidence that similarly situated inmates were treated differently." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007). However, even when someone is not found to be similarly situated to others, he is entitled to a determination of whether the distinction is arbitrary or rationally related to a legitimate penological objective. *Bills v. Dahm*, 32 F.3d 333, 336 (8th Cir. 1994) (citing *Parham v. Hughes*, 441 U.S. 347 (1979)).

To avoid summary judgment, Griffin must "identify affirmative evidence from which a jury could find proof of the pertinent motive, race discrimination." *Lewis*, 486 F.3d at 1028. Here, Griffin contends he was treated differently by Defendants who ignored or denied his requests for medical treatment because he is Black. Griffin presents direct evidence of discriminatory intent when, according to Griffin's sworn testimony, his requests for medical care were denied and both Defendants called him a "Nigger" and told him he could lay in his cell and die when he complained of chest pain and an

23

impending heart attack. The record contains no evidence disputing these facts. There can be no rational basis for denying an inmate medical care because he is Black. Therefore, there is a genuine issue of material fact as to whether the Defendants discriminated against Griffin on the basis of race in denying him adequate medical care.

### D. Qualified Immunity

The Defendants also contend they are entitled to qualified immunity on this claim. "Qualified immunity is an affirmative defense, so defendants have the burden of pleading and proving the defense." *Mahers v. Harper*, 12 F.3d 783, 785 (8th Cir. 1993) (citation omitted). The Court has already answered the first prong of the qualified immunity test affirmatively. Taking the facts in the light most favorable to Griffin, he has shown that the facts presented establish a violation of a constitutional right.

The Court must now determine whether this law was clearly established "so that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (citation omitted). The test "focuses on the objective legal reasonableness of an official's acts." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). "[T]he question is whether a reasonable official would have known that the specific conduct [Defendants] engaged in amounted to a constitutional violation . . . . Even when no decision involves similar facts, a right can be clearly established if a reasonable public official would have known that the conduct complained of was unlawful." *Williams v. Herron*, 687 F.3d 971, 977 (8th Cir. 2012) (quotations and citations omitted).

It is clearly established law that a detainee may not be denied access to services or intentionally discriminated against because of his race. *Wolff*, 418 U.S. at 556. No reasonable official could conclude, in light of clearly established principles governing

24

equal protection, that denying Griffin access to medical care because of his race was constitutionally permissible. Moreover, there is no conceivable legitimate penological purpose for doing so. *Damron v. N.D. Comm'r. of Corr.,* 299 F. Supp. 2d 970, 982 (D.N.D. 2004) ("[P]rison officials would have known that it was a violation of [plaintiff's] rights by intentionally treating him differently than other similarly situated inmates without a rational basis for the difference in treatment."). Griffin's sworn account of the Defendants' statements and actions that exhibit discriminatory animus are uncontradicted. Defendants are not entitled to qualified immunity.

In summary, Defendants are not entitled to summary judgment on Griffin's equal protection claim.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Doc. 24) is **DENIED.** This case will be scheduled for a jury trial.

**IT IS SO ORDERED** on this 4th day of November, 2019.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE